# CHARLESTON.

## CRIM *v.* POST.

Submitted September 11, 1895—Decided Dec. 4, 1895.

1. USURY—BONUS.

   Where a party buys a tract of land, paying therefor by the assignment of notes taken to himself for money loaned at a usurious rate of interest, apparent on the face of the notes; and afterwards the notes are counted up at the usurious rate, a bonus added, and new notes therefor given by the debtor to the assignee, with a deed of trust to secure their payment, and the new transaction is given the color of being a recission of the original sale and a resale of the land—*held*, the transaction is usurious.

2. USURY—INTEREST ON LOANS—RECOVERY ON LOANS.

   In this state six *per cent.* is the legal rate of interest, and, although it appear that more than lawful interest was reserved, yet the lender shall recover his principal money with six *per cent.* interest.

3. USURY—DEVICES TO EVADE USURY.

   But the statute contemplates that a search for usury shall not stop at the mere form of the bargains and contracts relative to such loan, but that all shifts and devices intended to cover a usurious loan or forbearance shall be pushed aside, and the transaction be dealt with as usury if it be such in fact.

4. CHANCERY COMMISSIONER'S REPORT—FINDINGS OF FACT.

   It is important that the master commissioner to whom causes are referred should furnish the court with findings of facts.

DAYTON & DAYTON and F. O. BLUE for appellant:

*Usury defined and legal rate of interest fixed.*—Code, c. 96, ss. 4, 5.

*Profit beyond legal rate of interest, reserved or agreed to be paid, contract is usurious.*—2 Paige, Chy. 267.

*Assignment of debt, usurious in its creation will not cover it from scrutiny of court.*—3 Johnson's Chy. 395.

*Usury depends on intent—and court will look to the whole transaction.*—Clarke's Chy. 281.

*Where debt or any part of it remains unpaid, and usurious interest has been paid thereon, a court of equity will credit such*

*usury on the principal remaining unpaid.*—21 W. Va. 523; 33 W. Va. 159.

*Particular cases.*—9 Paige, Chy. 483; 1 Sandford's Chy. 56; 88 Va. 674; 1 Paige, Chy. 544.

M. PECK for appellee:

*On disputed credits.*—1 Greenl. Ev. §§ 305, 118; 2 Greenl. Ev. § 517; 18 Am. & Eng. Enc. Law, 200.

*On usury.*—Tyler on Usury, 111, 367, 368, 92, 93, 112, 114, 108; 27 Am. & Eng. Enc. Law, 920; 37 W. Va. 291; 33 W. Va. 159; 23 Gratt. 225, 235; 4 N. Y. 225, 229; 1 Black. U. S. 115, 118, 119; 2 Call, (Va.) 110; 1 Am. Dec. 535.

*Disguised loans.*—Tyler on Usury, p. 365; 17 Gratt. 21.

*Evidence to establish a loan.*—57 Am. & Eng. Enc. Law, p. 1045.

HOLT, PRESIDENT:

On appeal from a decree of the Circut Court of Barbour county, entered on the 5th day of June, 1894, decreeing in favor of appellee, Crim, against defendant and appellant, Isaac W. Post, a sale under a deed of trust of the land of Post, he having pleaded usury to the debt secured.

In May, 1888, plaintiff, Crim, filed his bill in equity against Isaac W. Post, the trust debtor, M. Peck, trustee, Dever Pickens, executor of James Pickens, deceased, alleging, among other things: That on the 2d day of August, 1886, defendant Post was indebted to him in the sum of one thousand, five hundred and eighty nine dollars and eighty three cents, with interest thereon from the 1st day of August, 1886, and that to secure the payment thereof Post, by deed of trust of the same date, conveyed to Peck, trustee, the Thrash tract of land of one hundred and thirty eight and three-fourth acres, on Brushy Fork of Elk creek, in Barbour county, not before conveyed away, and all Post's other land adjoining thereto or in that vicinity; that Post, by deed of trust of 30th August, 1884, had conveyed the tract of one hundred and thirty eight and three-fourth acres to Dever Pickens, trustee, to secure to James Pickens a debt of two thousand, two hundred and fifty dollars; that James

Pickens is dead; Dever Pickens is his executor, but that that debt has long since been paid; that his own debt remains wholly unpaid; that there may be other liens; that Post, since the issuing the summons, by deed dated March 17, 1888, recorded May 5, 1888, sold and conveyed one hundred and twenty one and three-fourth acres jointly to John J. House and Ruhama Johnson, with intent to delay, hinder, and defraud plaintiff and other creditors; that plaintiff does not know the quantity or boundaries of lands included in his trust deed; and that M. Peck, trustee, had become interested by assignment in a portion of plaintiff's trust debt; and that the trustee regards it as improper for him to act otherwise than under the direction of the court. Therefore he prays that defendant Post may answer what lands he owned on 2d August, 1886; that if he can not do so, it may be ascertained by survey; that the liens on said land may be ascertained, together with their amounts and priorities; that the land may be sold, and the proceeds applied under the direction of the court; and for general relief.

Defendant Post answered, admitting the trust deed, *etc.*, but alleging that it was part and parcel of a long-continued transaction between Crim and himself, beginning years before the execution of the trust deed, in which transaction Crim exacted and defendant Post paid large sums of usury, for which he has not received, but is entitled to credit on the principal at the times of their payment; that he has continuously paid Crim large sums of usurious interest, and that when the trust is properly credited with the payments made and the usurious interest paid, the trust debt will be found to be paid off, and, likely, overpaid; that he is unable to itemize the usurious payments, but prays that Crim may discover the same, that the facts may be ascertained by a commissioner in chancery, *etc.*

By six distinct orders of reference the cause was referred to three different commissioners to ascertain and report upon these matters. Three several reports were made and filed; the last, and only one here involved, by Master Commissioner Kittle, to which both parties excepted. On this report and exceptions and papers theretofore read and orders entered the cause came on to be finally heard on the

5th day of June, 1894, whereupon the court pronounced the decree complained of giving a personal decree against Post in favor of Crim for one thousand, seven hundred and seventy dollars and thirty six cents, with interest from 2d August, 1886, as the amount due on the deed of trust, and appointed a commissioner, who, in case of non-payment within the time given, was directed to sell for cash enough to pay costs and expenses of sale, and for the balance on a credit of six, twelve, and eighteen months, and Post appealed. In this state interest beyond six *per cent.* is usurious.

The important facts in dispute take place in the inception of this long transaction, which the commissioner, with the parties and some twelve witnesses, on oral examination before him, has patiently endeavored to unravel. It begins with two notes executed by defendant Post.

On the 22d day of January, 1877, defendant Post borrowed of B. F. Stout nine hundred and forty dollars, and gave his single bill thereof of that date, payable one day after date, with interest at the rate of ten *per cent.* This note, with that rate of interest, amounted on the 20th day of March, 1879, to one thousand, one hundred and forty three dollars and fourteen cents On the 7th day of December, 1877, Post executed to Stout another single bill—this one for one thousand, five hundred dollars—of that date, due twelve months thereafter, calling for interest from date at the rate of twelve *per cent.* This note, at that rate of interest, amounted on the 20th day of March, 1879, to one thousand, seven hundred and thirty one dollars and fifty cents, and both of them to the sum of two thousand, eight hundred and seventy four dollars and sixty four cents, or, as Crim and Stout counted them up, to two thousand, eight hundred and seventy four dollars and seventy odd cents.

Plaintiff, Crim, was the owner of a tract of land of one hundred and twenty three and three-fourth acres, called the "Board Place," which in the way of debts he had bought for three thousand dollars, and was trying to sell at that price to Stout. Stout says that it was not worth more than two thousand, five hundred dollars or two thousand, six hundred dollars in cash; that he would not have

given more if he had had the money. On the 20th day of March, 1879, Stout bought of Crim the Board place at the price of two thousand, eight hundred dollars as of the 4th day of January, 1879, by transferring to said Crim notes to that amount on Isaac W. Post, which amount was paid by transferring to Crim the said Post notes, and they both executed and signed an article of agreement of that tenor and effect, and left it with Enoch Miller to hold for them. Stout allowed Crim, as interest on the Board land from January 4, 1879, to March 20, 1879, about thirty seven dollars and fifty cents, and Crim executed to Stout a duebill for about thirty seven dollars and thirty odd cents, the balance of the Post notes.

Post knew that Stout was buying the land, and paying for it with these notes, and wanted time; and in the verbal agreement which led to the written contract Crim agreed to give Post a "good, long time" in which to pay; say five years. Very soon after this, Crim sent word to Post that he had his notes, and Post went up to see him. Crim told him that he had taken the notes from Stout as cash, that they were due, and he expected him to pay the money. Post complained of Stout. Said he could not pay them without making a sacrifice. Then Stout went to see Crim. Said he was anxious to have the matter put in such shape as would give him his clear deed, give Post time, and fully secure Crim his debt. Crim desired Stout to take back the Post notes, pay five hundred dollars cash, and five hundred dollars a year to run for five years; but Stout refused, insisting on his contract for a "clear deed." On the 27th day of June, 1879, the parties came to an agreement which was carried out. Stout and Crim canceled the article of agreement between them for the sale and purchase of the Board land, dated 20th March, 1879, and executed a new one, just like it, except that it was dated as of the 1st day of January, 1879, and stated the Post notes as three thousand and seventy five dollars. Post executed to Crim his five single bills, all antedated on the 1st day of January, 1879; one for one thousand and seventy five dollars, due in one year, with interest from date, and four others of five hundred dollars, each due, respect-

ively, in two, three, four, and five years, with interest from date; and by deed of trust of that date—27th of June, 1879 —Post conveyed the real estate in the bill and proceedings mentioned, being his home place, and all adjoining land, to ———— Hall, trustee, to secure the payment of these notes, which amounted to three thousand and seventy five dollars, made up, I infer, of the following items: Two thousand, eight hundred and seventy four dollars and seventy odd cents, amount of the notes as computed by Crim on the 20th of March, 1879; two hundred dollars, which Post agreed to have added in for the time given; and twenty odd cents, which Crim paid Post in cash at the time. Six *per cent.* interest was charged and paid on these notes until they fell due; after that, ten *per cent.* was charged and paid on the note of one thousand and seventy five dollars, and eight *per cent.* on the others. On the 27th day of January, 1886, a settlement was made, and a new note and a new deed of trust were given. Again a settlement was made on the 2d day of August, 1886, and another new note and deed of trust were given, being the ones now in controversy.

1. Post claims credits not given, amounting to five hundred and eighty three dollars and twelve cents, which Crim denies; and the commissioner makes no report deciding the matter, but gives alternative statements based on the respective contention of the parties. The burden of proof is on the defendant, Post, to prove these disputed payments, and the court below held that Post had failed to prove them.

2. There are two items, one of two hundred dollars and the other assumed to be one hundred and fifty four dollars and eighty nine cents, which would be usurious under ordinary circumstances, and are taken to be so in one set of the alternative statements. On behalf of plaintiff, Crim, it is contended that the land, by virtue of the second tripartite arrangement, was really sold by Crim to Stout on payments running up to five years for the last one; and that the true purchase money was then and there taken to be three thousand and seventy five dollars as of the 1st day of January, 1879; and that Post became the "paymaster" directly to

Crim, for the benefit of Stout, in consideration of the time given him to pay and the surrender of the Stout notes by Crim; that Post in fact purchased the land for Stout, and he chose to pay the three thousand and seventy five dollars on time, rather than the two thousand, eight hundred dollars cash down; and that the whole matter was then and there settled and adjusted between Post and Stout on the basis of three thousand and seventy five dollars; and that, such being the intention of the parties, there can be no usury, for in determining the question of usury the intention of the contracting parties is the main determining factor. If the fact was that Crim then sold the land to Stout for three thousand and seventy five dollars which Post, Stout's debtor, then paid for Stout in that way, that, of course, would be an end of the question of usury; for Crim, the owner, could fix his price so much cash down, so much on a credit running through five years. The other parties could take it or not, as they saw fit. If this were the true state of the case, then it would be a purchase at an agreed price, and it could not possibly be usurious, but would fall within the principle applied in *Graeme* v. *Adams*, 23 Gratt. 225, 235; *Reger* v. *O'Neal*, 33 W. Va. 159 (10 S. E. 375); *Swayne* v. *Riddle*, 37 W. Va. 291 (16 S. E. 512) and like cases. See Com. Usury, p. 71; 27 Am. &. Eng. Enc. Law, 1000, note 1. But on this point, as a question of fact in this case, I do not see that there is much room for controversy. Stout says expressly that he bought this land from Crim by written contract, signed, sealed, and delivered by both parties on the 20th day of March, 1879, and then and there paid for it by transferring to Crim notes on Post to the amount of two thousand, eight hundred dollars as of the 4th day of January, 1879, and so reads the written contract itself. That Post had nothing to do with it except, having knowledge that such purchase and mode of payment were contemplated by Stout, he requested him to make it a part of the contract that Crim should give him time. Under this contract Stout took the land into actual possession; lived on it. He refused to rescind his contract. But he did agree on the 27th day of June, 1879, to substitute his old article of agreement by one which read as follows:

"Agreement. An article of agreement made and entered into between J. N. B. Crim and Benjamin F. Stout wit_nesseth: That the said J. N. B. Crim has sold one tract of land lying on the waters of Brushy Fork of Elk creek, known as the 'Board Farm,' containing one hundred and twenty three and three fourth acres, to the said Stout for the sum of three thousand and seventy five dollars in hand paid to the said Crim; and the said Crim binds himself to make the said Stout a general warranty deed. Witness our hand and seal, Jan. 1st, 1879. J. N. B. Crim. B. F. Stout." Stout says there was no rescission, no new sale, but an article of agreement of a new date, and new statement of the consideration, was substituted for the old one, in order to make it correspond with the agreement Post and Crim were making for the payment of the assigned notes; and this is nowhere contradicted. On the 27th day of April, 1879, a contract made on the 20th day of March, 1879, was given the appearance of having been made on the 1st day of January, 1879. In that way, and to that extent, Stout turned Post over to Crim as paymaster (using Mr. Crim's mode of describing the transaction) but he refused to accept a deed for the land which did not recite the transaction of the purchase and sale according to the fact. But, whether Stout participated in the arrangement in any other way or to any other extent, the notes started with usury on their face in the hands of Stout, and ended with additional usury in the hands of Crim; and such was the inevitable, ultimate effect of all the contracts relating to the money originally loaned by Stout to Post, assigned to Crim, and renewed at various times to Crim as the holder and owner. The statute under which this investigation took place evidently contemplated such new sub-stitutionary, colorable arrangements, and the various shifts and devices that are often used to cover up the usury; but the law requires the lender on oath to discover the money really lent, and all bargains, contracts, or shifts relative to such loan; and makes them ineffectual, no matter how complicated such contracts may be. The law evidently intends that the search for usury shall penetrate to the substance. *Pope* v. *Marshall*, 78 Ga. 635 (4 S. E. 116).

In this case the old notes were usurious on their face, and were counted up at the rates mentioned; the new notes had this vice, and three additional elements of usury: (1) the two hundred dollar bonus; (2) the usurious interest counted down to the 20th day of March, 1879; (3) then set back to bear interest again from the 1st day of January, 1879. The first day of January, 1879, was selected as the date when the new contract should be regarded as made, and the new interest begin to run. The two Post notes, counting legal interest, and stopping at that date, amounted to two thousand, six hundred and forty five dollars and forty cents. Counting at the rate of interest called for on their face—one at twelve *per cent.* the other at ten *per cent.* —and stopping at that date, would have summed up to two thousand, eight hundred and thirty eight dollars and ninety nine cents; but they counted them at the usurious rate, not stopping at 1st January, 1879, but going on down to the 20th March, 1879, the date of Stout's purchase of the Board land and Crim's taking of the notes by assignment, when, we may infer, they were counted up and made to amount at that date to two thousand, eight hundred and seventy four dollars and seventy odd cents. This was taken as the basis of the new notes, to bear date January 1, 1879, and carry interest from that time. Then the extra premium, a bonus of two hundred dollars, was added in as the consideration of the long credit given, making the sum of three thousand, and seventy four dollars and seventy odd cents. Mr. Crim handed Post twenty odd cents in money, making it even seventy five—three thousand and seventy five dollars. See 3 Minor, Inst. pt. 1, p. 311; Perley, Int. 202, 203; Tyler, Usury, 301 *et seq.*; *Beete* v. *Bidgood*, 7 Barn. & C. 453; 10 Bac. Abr. 271; Com. Usury, 100. And yet, if the contract of 20th of March, 1879, had not been made, and the contract of the 27th day of April, 1879, bearing the date of 1st of January, 1879, had been the first and only one, and Crim, taking that kind of pay on such long time, had seen fit to ask and receive three thousand and seventy five dollars for land which had cost him three thousand, what possible pretext could there have been for challenging its fairness or its legality, as being in its incep-

tion tainted with usury? Then the transaction would really have been in the shape that Crim at too late a period tried to give it—a sale by him for three thousand and seventy five dollars to Stout, Post making himself the paymaster, charging himself with the duty of paying the purchase money directly to Crim. If he saw fit to make such an arrangement with Stout to take up his notes, it was nothing for which Crim's part in the matter could be called in question. As it was, Crim was not a new obligee; certainly not a *bona fide* one; for he included in the new notes the usury called for on the face of the old notes, the usury of including such interest from the 1st day of January, 1879, to the 20th day of March, 1879, the bonus of two hundred dollars, which was usury, and the various payments of interest at the rates of ten *per cent.* and eight *per cent.*, which were paid him on the new notes.

The learned judge who decided the case in the Circuit Court took the view that the contract of 20th March, 1879, between Stout and Crim was canceled, and a new one entered into as of 1st January, 1879, and therefore he adopted the statement designated as "4th aspect by Crim's credits," which treats it as a sale at the price of three thousand and seventy five dollars, and, of course, not usurious. For the reasons already given, I do not concur in this view, but regard the new contract as a mere shift and device to get rid of the usury in the Stout notes and of the usury of the two hundred dollar bonus.

This brings us to the report of Commissioner Kittle, and the exceptions thereto. I should infer that the commissioner is an experienced accountant, and a good commissioner; but an appellate court can not end a case, or get on with it to any purpose, without a "finding of facts," right or wrong, made by some person. This the commissioner has, for some good reason no doubt, omitted to do in this case; but we can not go on with the case until the commissioner has ascertained the credits to which Post is entitled by reason of payments. The commissioner has the parties before him, and can sift such questions to the bottom, better than any jury; and he should give us his finding of facts, qualifying it with such doubts as he may feel; but, never-

theless, give us his inclination one way or the other. And the case will have to be recommitted for that purpose. But on examining this account on the exceptions this, among other things, has occurred to me, for example, the commissioner, in his statement No. 1, wishes to present an account according to Crim's claim of credits, but according to Post's claim of usury in the giving of the new notes; that is, on the theory that the two hundred dollar bonus is to be left out lawful interest counted on the two Stout notes down to the 1st day of January, 1879, and twenty odd cents in cash added. For fear of misapprehension, I add that I am not giving any direction binding, or even persuasive, for the reason that it is not my place to do so, and I may be mistaken, still in going over all these statements based on the hypothesis of usury at the inception of the transaction between Crim and Post, I find the commissioner starts as of the 1st day of January, 1879, with two thousand, seven hundred and twenty dollars and eleven cents, whereas I can only make it two thousand, six hundred and forty five dollars and forty cents plus twenty odd cents, paid Post in hand, to make it even three thousand and seventy five dollars, making a difference of seventy four dollars and fifty one cents.

With this view of the case, the decree complained of must be set aside, and the cause be remanded for further proceedings.